UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DEBORAH BELLINA                                    CIVIL ACTION

VERSUS                                                   NO. 19-13711

LIBERTY MUTUAL INSURANCE            SECTION "R" (3)
COMPANY

## ORDER AND REASONS

There are three motions before the Court. Defendant, Liberty Personal Insurance Company (Liberty),[1] moves for partial summary judgment on plaintiff's bad faith claims.[2] Liberty also moves *in limine* to exclude the testimony of plaintiff's expert, Brandon Simoneaux.[3] Plaintiff, Deborah Bellina, moves *in limine* to limit the expert testimony of Liberty's three experts, Dr. Lee Branscome, CCM; Jason Johnston, PE; and F. Dirk Carvajal, PE.[4] Bellina also moves to judicially estop Liberty from arguing that there was no hailstorm on the date of Bellina's reported loss.[5]

---

[1]     Liberty indicates that it is improperly named as Liberty Mutual Insurance Company. R. Doc. 27-1 at 1.
[2]     R. Doc. 28.
[3]     R. Doc. 27.
[4]     R. Doc. 30.
[5]     *Id.*

For the reasons that follow, the Court grants Liberty's motion for partial summary judgment, denies Liberty's motion *in limine* to exclude Brandon Simoneaux's expert testimony, and denies all of the relief that Bellina seeks in her motion *in limine*.

## I.    BACKGROUND

This case arises from property damage caused by an alleged hailstorm. Plaintiff, Deborah Bellina, alleges that, on January 18, 2019, she owned a house located at 72530 Military Road, St. Tammany Parish.[6]  On that date, Bellina claims that a hailstorm passed through the area causing significant damage to her house.[7]  Specifically, Bellina alleges that the roof of the main

---

[6]    R. Doc. 28-12 at 2 ¶ 3 (Liberty's Statement of Facts); R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).   Under Eastern District of Louisiana, Local Rule 56.1, the moving party must submit concise statement of material facts which it contends present no issue.  Liberty supplied the statement as required by the local rules.  R. Doc. 28-12.  Under Eastern District of Louisiana, Local Rule 56.2, the party opposing summary judgment, Bellina, must also include a list of facts which it contends present a genuine issue of material fact.  Bellina has supplied a statement. R. Doc. 34-6.  But Local Rule 56.2 also provides that "[a]ll material facts in the moving party's statement will be deemed admitted, for the purposes of the motion, unless controverted in the opponent's statement."  Bellina has admitted various facts by not controverting them.

[7]    R. Doc. 28-12 at 2 ¶ 3 (Liberty's Statement of Facts); R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

dwelling on her property, made of fiber cement shingles, was damaged by hail.[8]

It is undisputed that there is no meteorological evidence to indicate that hail fell on Bellina's property on January 18, 2019.[9]  It is also undisputed that Bellina was not in the house, nor on the property, at the time of the alleged hailstorm.[10]  Rather, Bellina was on vacation in Perdido Key, Florida, and returned home "a day or two after" the alleged January 18, 2019 storm, and claims to have noticed pieces of fiber cement shingles in her driveway upon her return to the property.[11]  She also stated that a friend and neighbor told her that there was a hailstorm while she was away.[12]

On January 25, 2019, Bellina reported the alleged hailstorm to Liberty and filed a coverage claim under her homeowners policy.[13]  Kate French, a

---

[8]      R. Doc. 28-12 at 2-3 ¶¶ 3, 5, 8, 13, 16;  (Liberty's Statement of Facts); R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[9]      R. Doc. 28-12 at 4 ¶ 27; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[10]      R. Doc. 28-12 at 2 ¶ 4; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[11]      R. Doc. 28-12 at 2 ¶ 5; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[12]      R. Doc. 28-12 at 2 ¶ 7; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)); *see also* R. Doc. 28-4 at 14 (Bellina Deposition at 14:18-22).

[13]      R. Doc. 28-12 at 2 ¶ 10; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

Liberty claims adjuster, was assigned to adjust Bellina's claim.[14]  French inspected Bellina's property on January 31, 2019.[15]  French was trained not to crawl or walk on fiber cement shingles because of their fragility.[16]  Instead, French testified that her inspection involved cooperation with an entity known as "Ladder Now."[17]  French testified that a representative from Ladder Now—whose name she could not recall—placed a ladder against the pitch of the roof, and climbed up the ladder.[18]  But the representative did not get off of the ladder to inspect the roof because of the concern that doing so would damage the fiber cement tiles.[19]  As a result, French testified that a follow-up drone inspection was ordered to assess the roof's condition.[20]

But French did conclude that other structures on Bellina's property were damaged by hail.[21]  Those structures were roofed with asphalt

---

[14]     R. Doc. 28-12 at 3 ¶ 11;  R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[15]     R. Doc. 28-12 at 3 ¶ 12; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[16]     R. Doc. 28-12 at 3 ¶ 14;  R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[17]     R. Doc. 28-5 at 30-31 (French Deposition at 30:7-31:9).

[18]     *Id*. at 30-31 (French Deposition at 30:7-31:9).

[19]     *Id*. at 31 (French Deposition 31:17-23).

[20]     *Id*. at 31-32 (French Deposition 31:25-32:10).

[21]     R. Doc. 28-12 at 3 ¶ 15;  R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

shingles,[22] as opposed to the fiber cement shingles on the roof of Bellina's main dwelling.  French testified that it is not unusual for some structures to show hail damage, while others do not.  She explained that "when you have a higher end roof, it does its job" in contrast to roofs made of less sturdy materials.[23]   French testified that the detached structures on Bellina's property had a "poor" roof structure and likely could have been damaged by "penny sized hail."[24]   French also testified that, although there was hail damage to the detached structures, she could not determine *when* that damage occurred.[25]

On February 8, 2019, Liberty engaged Jason Johnston, an engineer with Envista Forensics, to perform the drone inspection of the fiber cement shingle roof on Bellina's main dwelling.[26]  During his inspection, Johnston placed a ladder on the edge of the roof and "physically touch[ed] and inspect[ed] the roofing" from his ladder.[27]  Johnston used the drone to take

---

[22]    R. Doc. 28-12 at 3 ¶ 15; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).
[23]    R. Doc. 28-5 at 25-26 (French Deposition 25:24-26:14).
[24]    *Id.* at 30-31 (French Deposition 26:20-27:7).
[25]    *Id.* at 33 (French Deposition 33:20-23).
[26]    R. Doc. 28-12 at 3 ¶ 16; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).
[27]    R. Doc. 28-12 at 3 ¶ 18;  R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

pictures of the higher elevations of the roof.[28]   Johnston was able to take photos within two feet of the roof's surface with the drone.[29]   After his inspection, Johnston concluded that "the fiber cement tile roof . . . had not sustained any hail impact-related damage."[30]   Rather, Johnston found that "the roofing exhibited fractures consistent with mechanical damage[[31]] as well as edge delamination and erosion/pitting consistent with long-term wear/weathering."[32]

Soon after Johnston's inspection, Liberty declined to pay Bellina's claim.   Explaining Liberty's decision, French testified that Liberty found coverage for the hail damage to the detached structures on Bellina's property.[33]   But Liberty found that the damage to the roof of Bellina's main dwelling fell within the ambit of the policy's "wear, tear, and deterioration" exclusion.[34]   The relevant policy exclusion provides:

---

[28]   R. Doc. 28-12 at 4 ¶ 19; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[29]   R. Doc. 28-12 at 4 ¶ 20; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[30]   R. Doc. 28-7 at 2 ¶ 7 (Johnston Affidavit).

[31]   By "mechanical damage" Johnston means "foot traffic on [the] roof." *See* R. Doc. 28-6 at 46 (Johnston Deposition 46:9-10).

[32]   R. Doc. 28-7 at 2 ¶ 7 (Johnston Affidavit).

[33]   R. Doc. 28-5 at 36 (French Deposition at 36:12-37:10).

[34]   R. Doc. 28-12 at 4 ¶ 28; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

**SECTION I – PERILS INSURED AGAINST**

**COVERAGE A – DWELLING and COVERAGE B – OTHER STRUCTURES**

We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property.

We do not insure, however, for loss;

2. Caused by:
    e. Any of the following:
        (1) Wear and tear, marring, deterioration:
        (2) Inherent vice, latent defect, mechanical breakdown.[35]

French testified that Liberty found that the total amount of the covered loss, which included the detached structures, fell below Bellina's deductible.[36] As a result, Liberty did not pay Bellina's claim.[37]

Following Liberty's determination on coverage, Bellina engaged Brandon Simoneaux, a general contractor, to inspect the roof of her main dwelling.[38] In contrast to French and Johnston, Simoneaux climbed on to

---

[35]    R. Doc. 28-2 at 14 (Certified Copy of Liberty Policy).

[36]    R. Doc. 28-5 at 36 (French Deposition at 36:12-37:10).

[37]    R. Doc. 28-12 at 4 ¶ 28; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[38]    R. Doc. 28-12 at 5 ¶ 29.  Simoneaux could not remember the date of his inspection.  R. Doc. 28-8 at 32 (Simoneaux Deposition at 32:17-24).  But he testified that it was likely in March or April 2019.  *Id.*  It is an undisputed fact that Simoneaux performed his inspection after Liberty denied coverage.  R. Doc. 28-12 at 5 ¶ 29.

the roof of Bellina's main dwelling to inspect it.[39]  Simoneaux concluded that the roof of Bellina's main dwelling was damaged by hail.[40]

Bellina filed suit in state court on September 30, 2019.[41]  After litigation ensued, more experts weighed in on whether the roof of Bellina's main dwelling was damaged by hail.  In November 2020, Liberty's certified meteorologist, Dr. Lee. E. Branscome prepared an expert report.[42]  In an accompanying affidavit, Branscome avers that "there is no meteorological evidence of any kind to indicate that hail fell at the property on . . . January 18, 2019."[43]  Moreover, Branscome attests that "there were no reports of hail in St. Tammany Parish for any day during the study period, July 1, 2018 through January 25, 2019."[44]  Branscome further notes that, "if any hail fell on the property during the study period, it was small in size (approximately pea-size) and of brief duration (lasting less than a minute or two).[45]

Finally, at Bellina's request, Liberty engaged Dirk Carvajal, a civil engineer, to perform a follow-up inspection of the property on December 18,

---

[39]    R. Doc. 28-12 at 5 ¶ 30; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[40]    R. Doc. 28-12 at 5 ¶ 31; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[41]    R. Doc. 1-1.

[42]    R. Doc. 31-4 at 9 (Branscome Report).

[43]    R. Doc. 31-4 at 1 ¶ 7 (Branscome Affidavit).

[44]    *Id.* at 2 ¶ 8 (Branscome Affidavit).

[45]    *Id.* at 2 ¶ 9 (Branscome Affidavit).

2019.[46]  In his affidavit, Carvajal avers that his conclusion was consistent with what Johnston found from his drone inspection—that "the fiber cement shingle roof at the subject property did not sustain any hail damage" and that the damage he observed was instead consistent with "long-term wear/weathering in conjunction with material deficiencies."[47]

Plaintiff's suit is for coverage for the roof of her main dwelling.[48]  In addition, plaintiff seeks statutory penalties against Liberty, contending that Liberty acted in bad faith for failing to timely pay on the claim.[49]  Liberty moves for partial summary judgment on Bellina's bad faith claims.[50]  In addition, Liberty moves *in limine* to exclude the testimony of Bellina's expert witness, Brandon Simoneaux.

Bellina moves to limit[51] the expert testimony of Liberty's witnesses, Johnston, Carvajal, and Branscome, contending that none is qualified to render an opinion about the cause of damage to Bellina's roof.[52]  In addition,

---

[46]   R. Doc. 28-12 at 5 ¶ 34; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[47]   R. Doc. 31-3 at 2 ¶ 7 (Carvajal Affidavit).

[48]   R. Doc. 1-1 at 5.

[49]   *Id.*

[50]   R. Doc. 28.

[51]   Bellina styles her motion *in limine* as a motion to "limit" the testimony of Liberty's experts.  But in substance, Bellina argues that the Liberty's experts do not meet the *Daubert* standard and that their causation opinions should be excluded.  *See generally* R. Doc. 30-1.

[52]   R. Doc. 30.

Bellina asks that Liberty be judicially estopped from taking the position that there was no hailstorm on Bellina's property on the date of the loss.[53]   The Court considers the motions below.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).   "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting

---

53      R. Doc. 30-1 at 1.

10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id*. at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by

submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322 (emphasis added))).

### B.   Admissibility of Expert Testimony

The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000). Rule 702, which governs the admissibility of expert witness testimony, provides that an expert witness "qualified . . . by knowledge, skill, experience, training, or education may testify" if:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods
        to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court held that Rule 702 "requires the district court to act as a gatekeeper to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Metrejean v. REC Marine Logistics, LLC.*, No. 08-5049, 2009 WL 3062622, at *1 (E.D. La. Sept. 21, 2009) (quoting *Daubert*, 509 U.S. at 589).  This gatekeeping function applies to all forms of expert testimony.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

The Court's gatekeeping function consists of a two-part inquiry into reliability and relevance.  First, the Court must determine whether the proffered expert testimony is reliable.  The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998).  The reliability inquiry requires the Court to assess whether the expert's reasoning and methodology underlying the testimony are valid.  *See Daubert*, 509 U.S. at 593.  The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.  *See id.* at 590.  Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of

the case and whether it will thereby assist the trier of fact to understand the evidence; in other words, whether it is relevant. *See id.* at 591. "[F]undamentally unsupported" opinions "offer[] no expert assistance to the [trier of fact]" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005).

The Court's role as a gatekeeper does not replace the traditional adversary system. As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight," rather than the admissibility, of that opinion. *United States v. Hodge*, 933 F.3d 468, 478 (5th Cir. 2019) (quoting *United States v. 14.38 Acres of Land, More or Less Sit. In Leflore Cty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996)).

# III.  DISCUSSION

## A.    Partial Summary Judgment

Liberty moves for partial summary judgment on plaintiff's bad faith claims.[54]  These are claims for statutory penalties under Louisiana Revised Statutes 22:1892 and 22:1973.[55]  Louisiana Revised Statute 22:1892 requires insurers to "pay the amount of any claim due to any insured within thirty days after receipt of satisfactory proofs of the loss from the insured or any party in interest." The statute further provides that an insurer's "[f]ailure to make such payment within thirty days after the receipt of such satisfactory written proofs and demand . . . when such failure is arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount to be due from the insurer to the insured, or one thousand dollars, whichever is greater." La. Rev. Stat. 22:1892.  Louisiana Revised Statute 22:1973 similarly provides that "[f]ailing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the

---

[54]    R. Doc. 28-1.
[55]    Courts sometimes refer to claims brought under these statutes colloquially referred as "bad faith" claims. *See Guillory v. Lee*, 16 So.3d 1104, 1111 (La. 2009).

claimant when such failure is arbitrary, capricious, or without probable cause" subjects the insurer to additional monetary penalties.

The Louisiana Supreme Court has held that Sections 1892 and 1973[56] proscribe "virtually identical" conduct and that "[t]he primary difference is the time periods allowed for payment." *Reed v. State Farm Mut. Auto. Ins.*, 857 So. 2d 1012, 1020 (La. 2003). To succeed under either statute, the plaintiff must prove by a preponderance of evidence that the denial of coverage was "arbitrary, capricious, or without probable cause." *Guillory v. Lee*, 16 So. 3d 1104, 1126–27 (La. 2009).

A refusal to pay coverage is "arbitrary, capricious, or without probable cause," when the denial of payment is "'vexatious,'" meaning "'unjustified, without reasonable or probable cause or excuse.'" *Guillory*, 16 So. 3d at 1126–27 (citing *Reed*, 857 So. 2d at 1020). If "the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense," then the denial of coverage is not arbitrary, capricious, or without probable cause. *Id.* at 1127. Put another way, "where the insurer has legitimate doubts about coverage, the insurer has the right to litigate these questionable claims

---

[56] The Court notes that Sections 1892 and 1973 were previously codified at La. Rev. Stat. 22:658 and La. Rev. Stat. 22:1220, respectively. *See Est. of Munsterman v. Unitrin Auto & Home Ins.*, 307 So. 3d 297, 303 (La. App. 3 Cir. 2020).

without being subjected to damages and penalties." *Calogero v. Safeway Ins. Co. of La.*, 753 So. 2d 170, 173 (La. 2000).

Bellina bears the burden of showing that Liberty is liable under the bad faith statutes. As a result, it is incumbent upon Bellina to set out specific facts showing that Liberty's conduct in declining to pay on the claim was arbitrary and capricious. *See Celotex*, 477 U.S. at 324-25; *see also Marcelle v. Southern Fidelity Ins.*, 954 F. Supp. 2d 429, 435-36 (E.D. La. 2013) (under Louisiana law, "when an insurer seeks summary judgment on a statutory penalties issue . . . the insured must offer some evidence in support of their bad faith claim to defeat summary judgment"); *DeFrancesch, M.D, L.L.C. v. Employers Mut. Cas. Co.*, No. 06-5920, 2008 WL 1930450, at *4 (E.D. La. Apr. 30, 2008) (applying Louisiana law to grant summary judgment when plaintiff did not present evidence demonstrating the existence of a genuine issue of material fact to support its claim that defendant has acted arbitrarily and capriciously); *Gates v. Auto Club Family Ins.*, No. 06-4394, 2007 WL 1464259, at *4 (E.D. La. May 17, 2007) (same).

Here, plaintiff has not provided any facts in her opposition to indicate that Liberty's conduct was arbitrary and capricious. Rather, plaintiff's argument focuses on the failure of Liberty's adjusters and experts to climb

onto the roof of Bellina's main dwelling to inspect it.[57]  Plaintiff's view is that Liberty's inspections were deficient as a result.  Plaintiff points out that her expert, Brandon Simoneaux, climbed the roof during his inspection, and concluded that hail was the source of the damage.[58]  Liberty's experts provide reasonable explanations for why they did not climb on to the roof.  It is an undisputed fact that French was trained not to walk or crawl on fiber cement shingles because of their fragility.[59]  Johnston also testified that it would not have been possible to walk on the fiber cement shingles on Bellina's roof without damaging them.[60]  Even Brandon Simoneaux, plaintiff's expert, admitted that it is possible to damage fiber cement shingles by walking on them.[61]  At bottom, plaintiff's argument is that Simoneaux's inspection was more trustworthy than those conducted by French, Johnston, and Carvajal. Plaintiff fails to establish that Liberty's refusal to pay "is not based on a good-faith defense," or that Liberty's refusal to pay on the claim is "vexatious." *Guillory*, 16 So. 3d at 1127.

---

[57]    R. Doc. 34 at 1.

[58]    *Id.* at 3.

[59]    R. Doc. 28-12 at 3 ¶ 14; R. Doc. 34-6 (Bellina's Statement of Facts (not controverted)).

[60]    R. Doc. 28-6 at 26 (Johnston Deposition 26:4-7).

[61]    R. Doc. 28-8 at 35 (Simoneaux Deposition 35: 13-14).

In the context of a bad faith claim, "[a]n insurer's conduct depends on the facts known to the insurer at the time of its action . . . ." *Louisiana Bag Co. v. Audubon Indem. Co.*, 999 So. 2d 1104, 1114 (La. 2008).   It is undisputed that Jason Johnston inspected the property on February 8, 2019 and found no indications of hail damage to Bellina's roof on that date.   From his inspection, Johnston testified that he observed roof tiles that "were older, weathered, covered in a build-up of dirt, debris, and algae."[62]   He also noted parts of the roof had deteriorated in a manner "consistent with erosion and pitting of the roof material."[63]   Ultimately, Johnston concluded that the roof "exhibited fractures consistent with mechanical damage as well as edge delamination   and   erosion/pitting   consistent   with   long-term wear/weathering."[64]   Following Johnston's inspection, Liberty found that coverage for Bellina's roof was barred under the "wear and tear" exclusion.

The Liberty policy does not define the term "wear and tear."   Under Louisiana law, the Court must give the words their plain meaning.   La. Civ. Code. art. 2047.   "Dictionaries, treatises, and jurisprudence are helpful resources in ascertaining a term's generally prevailing meaning."   *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 210 (5th Cir. 2007) (applying

---

[62]     R. Doc. 28-6 at 27 (Johnston Deposition 27:3-7).
[63]     *Id.* at 31 (Johnston Deposition 31:3-4).
[64]     R. Doc. 31-2 at 2 ¶ 7 (Johnston Affidavit).

Louisiana law). "'[T]he words 'wear and tear' mean simply and solely that ordinary and natural deterioration or abrasion which an object experiences by its expected contacts between its component parts and outside objects during the period of its natural life expectancy.'" 6 *New Appleman on Insurance Law Library Edition* § 62.07 (2020) (quoting *Cyclops Corp. v. Home Ins.*, 352 F. Supp. 931, 936 (W.D. Pa. 1973)).  In other words, the term wear and tear refers "to the damage caused in an ordinary, natural or normal course." *Libbey Inc. v. Factory Mut. Ins.*,  No. 06-2412, 2007 WL 9757792, at *5 (N.D. Ohio June 21, 2007); *see also Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 353 (6th Cir. 2005) (concluding that "wear and tear" refers to damage resulting from normal or ordinary use of the insured property).

Given that Johnston indicated that he found signs of "delamination and erosion/pitting consistent with long-term wear/weathering," the Court finds that Liberty had a good-faith reason to find that the exclusion barred coverage at the time it declined to pay Bellina's claim.  When an insurer has a good-faith reason to believe that an exclusion bars coverage, it does not act in bad faith by not paying on the claim and instead choosing to litigate the question of coverage. *See, e.g.*, *Estate of Munsterman v. Unitrin Auto & Home Ins.*, 307 So. 3d 297, 306 (La. App. 3 Cir. 2020) (denying bad-faith

damages where an insurer "had a legitimate and reasonable doubt[] about coverage" based upon a policy exclusion); *Tally v. Blue Cross Blue Shield of La.*, 760 So. 2d 1193, 1195-96 (La. App. 3 Cir. 2000) (finding that insurer did not act in an arbitrary and capricious manner in denying payment because the insurer had a just and reasonable grounds to believe that an exclusion applied); *see also Marcelle*, 954 F. Supp. 2d at 435-36 (same). Accordingly, the Court grants Liberty's motion for summary judgment on plaintiff's bad faith claims.

### B.   Defendant's Motion *in Limine*

Liberty moves *in limine* to exclude the testimony of Bellina's construction expert, Brandon Simoneaux.[65] Liberty argues that Simoneaux lacks specialized knowledge from which he can offer an expert opinion,[66] that Simoneaux's testimony is not based on sufficient facts or data,[67] and that Simoneaux did not adequately consider and rule out alternative causes for the roof damage.[68] The Court does not find any of Liberty's arguments persuasive, and it finds Simoneaux's expert testimony reliable, helpful to the trier of fact, and admissible under Federal Rule of Evidence 702.

---

[65]   R. Doc. 27.
[66]   R. Doc. 27-1 at 5.
[67]   *Id.* at 7.
[68]   *Id.* at 8.

### 1.   *Simoneaux's Specialized Knowledge and Experience*

Simoneaux possesses the professional experience necessary to offer an expert opinion on whether hail caused the damage to Bellina's roof.  It is well-established that an expert can be qualified based on professional experience. *See* Fed. R. Evid. 702 (providing that a witness may be qualified as an expert through "experience"); *see also Panhandle Advertising, LLC v. United Rentals Realty, LLC*, No. 19-189, 2021 WL 1112901, at *4 (N.D. Tex. Feb. 12, 2021) (finding expert with thirty years' experience in construction industry qualified to offer expert testimony on matters related to construction); *Arlington S. Hills, LLC v. Am. Ins.*, 51 F. Supp. 3d 681, 691 (N.D. Tex. 2014) (finding that a state certified building inspector with twenty-five years of experience in inspecting hail claims was qualified to testify about causation of damage to property during wind and hailstorm).

Simoneaux testified that he has sixteen years' experience as an independent insurance adjuster[69] and seven years of experience as general contractor.[70]  He is licensed by the State of Louisiana to work in both of those capacities.[71]  For his contractor's license, Simoneaux testified that he had to

---

[69]   R. Doc. 27-2 at 10 (Simoneaux Deposition 10:9-12).
[70]   *Id.* at 15 (Simoneaux Deposition 15:2-3).
[71]   *Id.* at 14-15 (Simoneaux Deposition 14:5-15:7).

take courses in building construction.[72]  His deposition also indicates that he is the owner of a construction company called Ashley Smith Construction.[73] Simoneaux testified that he has "inspected every material out there on the market" for roofs.[74]  He stated that he has "probably" inspected between "8,000 to 10,000" roofs in the course of his career.[75]  Other Courts have found that experts with similar backgrounds are qualified to testify regarding whether hail was the cause damage to property.  *See, e.g.*, *Grand Rsrv. of Columbus, LLC v. Prop.-Owners Ins.*, 721 F. App'x 886, 888 (11th Cir. 2018) (finding a witness who had examined over 1,000 roofs for damage was qualified to testify as an expert witness on hail damage*); Finch v. Owners Ins. Co.*, No. 161-169, 2019 WL 430931, at *6 (S.D. Ga., Feb. 4, 2019) (finding that an expert who worked in the construction business was qualified to testify that hail damage caused water intrusion of a building); *Lopez v. Farmers Ins.*, No. 10-584, 2011 WL 2020699, at *2 (W.D. Okla. May 24, 2011) (finding that an expert witness who owned a roofing company was qualified to testify whether a roof reflected hail damage).  The Court finds

---

[72]   *Id.* at 15 (Simoneaux Deposition 15:7-17).
[73]   *Id.* at 14 (Simoneaux Deposition 14:18).
[74]   *Id.* at 37 (Simoneaux Deposition 37:17-22).
[75]   *Id.* (Simoneaux Deposition 37:17-22).

that Simoneaux possesses the necessary experience to offer an expert opinion on whether hail caused the damage to Bellina's roof.

### 2. Simoneaux's Methodology

The Court finds that Simoneaux used a reliable methodology in his inspection. Simoneaux indicated that he began by determining how to safely get on the roof.[76] Simoneaux testified that he climbed onto Bellina's roof[77] and noted that it had "wide copper valleys . . . to walk on."[78] In addition to the copper valleys, Simoneaux indicated that he also walked on the fiber cement shingles.[79] Simoneaux conceded that an inexperienced person could damage the fiber cement slate shingles by walking on them,[80] but he testified that he was able to walk on them without causing damage because he knew how to place his feet on the strongest part of the shingles.[81]

Relying on his construction knowledge,[82] Simoneaux testified that he observed "indentations in the metal" consistent with hail impact.[83] In addition, he observed "clean breaks" in the fiber cement shingles.[84] To

---

[76]    *Id.* at 33 (Simoneaux Deposition 33:20-25).
[77]    *Id.* at 34 (Simoneaux Deposition 34:13-15).
[78]    *Id.* at 33 (Simoneaux Deposition 33:20-25).
[79]    *Id.* at 34 (Simoneaux Deposition 34:10-15).
[80]    *Id.* at 35 (Simoneaux Deposition 35:13-14).
[81]    *Id.* at 35 (Simoneaux Deposition 34:1-8).
[82]    *Id.* at 42 (Simoneaux Deposition 42:24-25).
[83]    *Id.* (Simoneaux Deposition 42:10-15).
[84]    *Id.* at 44 (Simoneaux Deposition 44:4-9).

Simoneaux, those clean breaks indicated "new, fresh damage."[85]   Rejecting the idea that the clean breaks were associated with wear and tear, Simoneaux noted that "[g]enerally speaking, if [damage] is due to weather or expansion-contraction in materials . . . , [o]ver time, algae will set in and that's how you can determine sometimes how long the crack has been sitting there."[86] Simoneaux testified that he found "no dirt and/or algae growth residue on the cracked interior surfaces."[87]

Simoneaux also rejected the idea that the damage he observed was caused by foot traffic.  He testified that when "hail came down, [it] impacted [the roof] with a velocity that caused [the tile] to break off, creating a fresh seam."[88]   Had the damage been caused by foot traffic, Simoneaux said, "all the algae would be scraped in [the] direction" of the person's foot and would appear over the clean break.[89]   Given Simoneaux's extensive experience in inspecting roofs that have been damaged by hail, the Court finds Simoneaux's physical inspection a reliable methodology to determine the cause of damage to Bellina's roof.

---

[85]   *Id.* (Simoneaux Deposition 44:24).
[86]   *Id.* at 46-47 (Simoneaux Deposition at 46:22-47:4).
[87]   *Id.* at 44 (Simoneaux Deposition at 44:9).
[88]   R. Doc. 27-2 at 55 (Simoneaux Deposition at 55:20-25).
[89]   *Id.* (Simoneaux Deposition at 55:20-56:5).

Liberty makes two unpersuasive arguments in an attempt to show that Simoneaux's methodology was unreliable.  First, Liberty contends that Simoneaux did not review any weather reports of hailstorms before inspecting Bellina's roof but relied instead on second-hand statements from plaintiff that a hailstorm occurred on the property.[90]  The Court does not find the failure to consult weather reports fatal to Simoneaux's testimony. Simoneaux explained his reasons for determining that the damage was of the type that is consistent with hail damage.  Further, Simoneaux stated that the clean breaks in the tiles indicated damage of recent origin and that the breaks were not consistent with wear and tear.  Further, as an expert, he is not forbidden from considering Bellina's hearsay report about a hailstorm in the area.  *See Greenwood Utilities Comm'n v. Mississippi Power Co.*, 751 F,2d 1484, 1495 (5th Cir. 1985) (noting that experts may rely on hearsay if experts in the field reasonably rely on such sources of information).  These asserted weaknesses in Simoneaux's approach are best addressed on cross-examination.

Second, Liberty argues that Simoneaux did not adequately consider and rule out alternative causes for the roof damage.[91]  In the context of

---

[90]    R. Doc. 27-1 at 7.
[91]    *Id.* at 8.

medical causation, the Fifth Circuit has held that an expert's "failure to consider and exclude other potential causes of [plaintiff's] injury before offering an opinion renders his testimony unreliable." *McNabney v. Laboratory Corp. of America*, 153 F. App'x 293, 295 (5th Cir. 2005). Liberty asserts that, under this principle, Simoneaux's testimony is unreliable because he failed to consider obvious alternatives in proffering his expert opinion.[92]

Regardless of whether eliminating alternative causes is required or merely one way of assuring reliability, *see Chisesi Bros. Meat Packing Co., Inc. v. Westchester Surplus Lines Ins.*, No. 09-6523, 2010 WL 3720465, at *4 (E.D. La. Sept. 9, 2010) (observing in a property damage case that "[e]limination of alternative possibilities is one method arriving at a result reliably, but it is not the only method"), the Court finds that Simoneaux considered and ruled out alternatives. During his deposition, Simoneaux was asked if the breakage on the roof could have been caused by an inexperienced person walking on the roof.[93] Simoneaux ruled out this alternative, "[b]ased upon how the tiles are laid and how they're installed."[94] He contended that the breaks in the roof occurred at "weak point[s]" that are

---

[92]    *Id.*

[93]    R. Doc. 27-2 at 43 (Simoneaux Deposition at 43:13-45:6).

[94]    *Id.* at 45 (Simoneaux Deposition at 45:11-19).

"not affected . . . if you walk on a shingle correctly," but that that the relevant points on the shingles could be damaged by hail.[95]  He also noted that, had the damage been caused by foot traffic, the algae would have been scraped in the direction of the person's foot. [96]   Similarly, Simoneaux noted that the absence of the algae on the clean breaks indicated that the damage was not consistent with wear and tear and deterioration.[97] In sum, the Court finds Simoneaux's testimony reliable, that his testimony will aid the trier of fact, and the Court denies Liberty's motion *in limine* to exclude his expert testimony.

### C.    Plaintiff's Motion *in Limine*

Plaintiff moves *in limine* to limit the expert testimony of Liberty's experts, Branscome, Johnston, and Carvajal.[98]  Plaintiff also moves to estop defendant's suggestion that no hailstorm occurred on the date of Bellina's claimed loss.[99]  For the reasons below, the Court denies plaintiff's motion.

#### 1.    *Dr. Lee Branscome, CCM*

Branscome is Liberty's weather expert.   Branscome's CV indicates that he has a Ph.D. in Meteorology from Massachusetts Institute of

---

[95]   *Id.* (Simoneaux Deposition at 45:11-19).
[96]   *Id.* at 55 (Simoneaux Deposition at 55:20-56:5).
[97]   *Id.* at 45 (Simoneaux Deposition at 45:23-24).
[98]   R. Doc. 30-1.
[99]   *Id.* at 1.

Technology.[100]   His CV also indicates that he has published articles on extreme weather events and forensic meteorology[101] and that he has offered expert testimony in over fifty cases in state and federal courts in the past four years.[102]   In this case, Branscome concluded that (1) "there is no meteorological evidence of any kind to indicate that hail fell" on Bellina's property the day of the loss,[103] and (2) that "if any hail fell on the property . . . it was small in size [and] not capable of causing property damage."[104]  The Court finds that Branscome possesses the requisite qualifications to testify regarding the issue of whether hail fell on Bellina's property on the date of the loss, and what size of hail is capable of inflicting property damage.

### a.    No meteorological evidence of hailstorm

The Court finds Branscome's employed a reliable methodology to conclude that there is no meteorological evidence of a hailstorm on the date of the reported loss.   In his expert report, Branscome indicates that he reviewed the National Weather Service (NWS) archives for any Severe Thunderstorm Warnings that were issued over the study period.[105]  He also

---

[100]    R. Doc. 31-4 at 12 (Branscome CV).
[101]    *Id.* (Branscome CV).
[102]    *Id.* at 15-18 (Branscome List of Expert Testimony)
[103]    *Id.* at 2 ¶ 8 (Branscome Affidavit).
[104]    *Id.* at 2 ¶¶ 8-10 (Branscome Affidavit).
[105]    *Id.* at 3 (Branscome Expert Report).

contends that he examined "surface weather charts . . . that provide an overview of the weather across Louisiana," which would "show any high-and low-pressure areas and frontal systems that could influence the weather across the state."[106]   Branscome also indicates that he reviewed local storm reports,[107] Doppler radar data,[108] academic articles,[109] and other sources. Other courts have found a similar review and synthesis of meteorological materials, by a qualified meteorological expert, a reliable method of concluding whether there was a hailstorm on a given date. *See Huntington Chase Condo. Ass'n v. Mid-Century Ins.*, 379 F. Supp. 3d 687, 702 (N.D. Ill. 2019) (finding that meteorologist with similar credentials and methodology could opine on whether hail fell at the subject property over a certain time period); *Arlington*, 51 F. Supp. 3d at 687 (same).   The Court finds that Branscome's methodology reliable in service of his conclusion that there is no meteorological evidence of a hailstorm on Bellina's property on the date of the reported loss.

---

[106]   *Id.* at 4 (Branscome Expert Report).
[107]   *Id.* (Branscome Expert Report).
[108]   *Id.* at 4-5 (Branscome Expert Report).
[109]   *Id.* at 10 (Branscome Expert Report).

b.      Hail size capable of causing property damage

Plaintiff contends that Branscome is not qualified to testify on the relationship between the size of a hailstone and how much damage it can do to property.[110]  In his expert report, Branscome explains that the "kinetic energy of a hailstone is approximately proportional to the fourth power of its diameter."[111]  He indicates that "pea-size hail (0.25" in diameter) carries only about .4% of the kinetic energy of 1" hail."[112]  He indicates that "[b]ased on real-word storm experience and laboratory experiments, the National Weather Services (NWS) considers hail of 1.00" in diameter (quarter size) to be the minimum size capable of causing damage to property."[113]  It is for this reason, Branscome indicates, that the NWS will issue a Severe Thunderstorm Warning only if a thunderstorm is expected to contain hail that is 1" in diameter or larger, because smaller hail is "inconsequential in terms of its ability to cause damage."[114]  Courts have found that meteorologists who, like Branscome, conducted a meteorological study of an area, are qualified to opine on the size of hail that might have been associated with any given storm.  *Huntington*, 379 F. Supp. 3d at 702 (finding that meteorologist with

---

[110]      R. Doc. 30-1 at 3.
[111]      R. Doc. 31-4 at 3 (Branscome Expert Report).
[112]      *Id.* at 3 (Branscome Expert Report).
[113]      *Id.* (Branscome Expert Report).
[114]      *Id.* (Branscome Expert Report).

similar credentials and methodology could opine on the likely size of hail that fell on a given date); *Arlington*, 51 F. Supp. 3d at 687 (same).  The Court also finds that Branscome's opinion regarding the diameter of hail that can cause property damage is reliable.  *Cf. Lowen Valley View, L.L.C.*, 892 F.3d at 170-71 (noting that experts were concerned with whether hailstones were greater than 1" in diameter).  In sum, the Court finds Branscome's expert testimony reliable, helpful to the trier of fact, and admissible under Federal Rule of Evidence 702.

### 2.  *Jason Johnston, PE*

Plaintiff moves to limit Johnston's testimony, contending that Johnston lacks the requisite experience or specialized knowledge to opine on the cause of the damage to Bellina's roof.[115]  Johnston testified that he has a B.A. in Civil Engineering from Louisiana Tech University.[116]  He testified that, at the time of his inspection, he had been working as an engineer for Envista Forensics for seven years.[117]  He states that, during those seven years, he conducted "a lot of analys[e]s of storm-related damage."[118]  Specifically, Johnston indicates that he has inspected at least 100 hail events while

---

[115]  R. Doc. 30-1 at 4.
[116]  R. Doc. 28-6 at 5.
[117]  *Id.* at 8 (Johnston Deposition 8:9-18).
[118]  *Id.* (Johnston Deposition 8:21-22).

working for Envista.[119]  In addition, he testified that "probably around a dozen" of those inspections involved fiber cement shingle roofs.[120]  The Court finds that Johnston's experience in investigating hail events renders him qualified to opine on the cause of damage to Bellina's roof.  *See Arlington*, 51 F. Supp. 3d at 687 (finding that civil engineer was qualified to opine on whether hail damaged concrete roof tiles); *Clena Invs., Inc. v. XL Specialty Ins.*, 280 F.R.D. 653, 661, 665 (S.D. Fla. 2012) (concluding that a civil engineer was qualified to opine that a hurricane was the cause of property damage).

The Court also finds Johnston's methodology reliable.  Johnston explains that he inspected Bellina's property, looking for "[e]xposed wood," "light poles," and other objects which might have "any kind of spatter marks or indentations" or marks that might be "indicative to recent exposure to hail."[121]  Johnston testified that he also used his "ladder to lean on the eaves of the roof anywhere [he] could get access."[122]  From his ladder, Johnston "physically touch[ed] and inspect[ed] the roofing."[123]  And for the areas of Bellina's roof that Johnston could not examine from his ladder, he deployed

---

[119]   *Id.* at 20 (Johnston Deposition 20:1).
[120]   *Id.* (Johnston Deposition 20:4-7).
[121]   R. Doc. 28-6 at 22-23 (Johnston Deposition 22:25-23:12).
[122]   *Id.* at 23 (Johnston Deposition 23:9-12).
[123]   *Id.* (Johnston Deposition 23:9-12).

a drone.  Johnston indicated that the drone took photographs from "as close as two feet away" from the roof's surface itself.[124]  Johnston observed some roof tiles that "were older, weathered, covered in a build-up of dirt, debris, and algae."[125]  He also observed that parts of the roof had deteriorated in a manner "consistent with erosion and pitting of the roof material."[126]   In addition, Johnston testified that, because some of the damaged tiles "were not randomly distributed . . . but really w[ere] just kind of concentrated" along "the valleys or the hips" of the roof,[127] he thought some of the damage was caused by  "foot traffic on [the] roof."[128]  Johnson's ultimate conclusion was that the roof "exhibited fractures consistent with mechanical damage as well as edge delamination and erosion/pitting consistent with long-term wear/weathering."[129]   The Court finds Johnston's methodology of conducting a physical inspection, supplemented by photographs from a drone, reliable, and that his expert opinion is admissible under Federal Rule of Evidence 702.

---

[124]    *Id.* at 24 (Johnston Deposition 24:14-15).
[125]    *Id.* at 27 (Johnston Deposition 27:3-7).
[126]    *Id.* at 31-32 (Johnston Deposition 31:3-4, 32:4-6).
[127]    *Id.* at 45 (Johnston Deposition 45:8-14).
[128]    *Id.* at 46 (Johnston Deposition 46:4-13).
[129]    R. Doc. 31-2 at 2 ¶ 7 (Johnston Affidavit).

3.    *F. Dirk Carvajal, M.E., P.E.*

Plaintiff also moves to limit Carvajal's testimony, alleging that Carvajal lacks the requisite experience or specialized knowledge to opine on the cause of the damage to Bellina's roof.[130]   Carvajal's CV indicates that he has a Master's degree in Civil Engineering.[131]   His CV also indicates that he is licensed as a Professional Engineer in ten states.[132]   It further indicates that Carvajal has "over 24 years of engineering experience," as well as specific experience investigating damage to roofs.[133]   He holds professional affiliations with the American Society of Civil Engineers and Structural Engineers Association of Texas.[134]   The Court finds that Carvajal is qualified to render an expert opinion as to the cause of damage to the roof of Bellina's main dwelling. *Arlington*, 51 F. Supp. 3d at 687; *Clena*, 280 F.R.D. at 665.

The Court also finds that Carvajal employed a reliable methodology. Carvajal's expert report indicates that he went to Bellina's property and "performed additional observations" of "selected roof surfaces, representing every cardinal direction, to see if there was any hail damage to the fiber

---

[130]    R. Doc. 30-1 at 4.
[131]    R. Doc. 31-3 at 60 (Carvajal CV).
[132]    *Id.* at 61 (Carvajal CV).
[133]    *Id.* at 60 (Carvajal CV).
[134]    *Id.* at 61 (Carvajal CV).

cement tile roof surfaces."[135]  As part of his inspection Carvajal indicates that he reviewed Brandon Simoneaux's report, as well as photographs taken by Johnston's drone.[136]  Carvajal found "moss/lichen growth on tiles, weathered fractures, delamination, and weathering."[137]  His  report indicates that there is "no evidence . . . that would indicate that the fiber cement tile roofing had been damaged by hail."[138]  Instead, Carvajal indicated that he observed "broken tiles . . . on the north facing roof up-slope."[139]  Carvajal also indicated that the "broken tiles were oriented linearly from the dormer to the upper roof consistent with foot traffic."[140]  The Court finds Carvajal's physical inspection, together with his review of photographs and another expert's report, to be a reliable methodology.  His testimony is admissible under Federal Rule of Evidence 702.

### 4.   *Judicial Estoppel*

Plaintiff also contends that Liberty must be judicially estopped from suggesting that there was no hailstorm on the date of the loss.[141]  The doctrine of judicial estoppel "generally prevents a party from prevailing in

---

135   *Id.* at 6 (Carvajal Report).
136   *Id.* at 5 (Carvajal Report).
137   *Id.* at 6 (Carvajal Report).
138   *Id.* at 7 (Carvajal Report).
139   *Id.* (Carvajal Report).
140   *Id.* (Carvajal Report).
141   R. Doc. 30-1 at 1.

one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  The Fifth Circuit requires courts to consider three factors in deciding whether to apply the doctrine of judicial estoppel.  The Court must determine whether "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently."  *Reed v. City of Arlington*, 650 F.3d 571, 573-74 (5th Cir. 2011) (en banc).

Bellina represents that Liberty should be judicially estopped from taking the position that there was no hailstorm on the date of the reported loss because Liberty found hail damage on the roofs of the detached structures on plaintiff's property.[142]  Bellina mischaracterizes Liberty's position.  Liberty contends, by way of its expert Branscome, that there is no meteorological evidence of a hailstorm on Bellina's property on the date of the loss, and that if there was a hailstorm, it would have produced pea-size hail.  Liberty admitted that it found hail damage to the detached structures, but French and Johnston both explained that it is possible for some structures to show signs of hail damage, while others do not, based on the

---

[142]  R. Doc. 30 at 1.

relative quality of the roofing materials.[143]  French noted that the dwelling and the detached structures were roofed with different materials and that the fiber cement shingles on the roof of the main dwelling were of a superior quality.[144]  In addition, plaintiff fails to even argue that the other conditions for judicial estoppel exist—that the Court "accepted" Liberty's prior position and that Liberty did not act "inadvertently."  It is Bellina's burden to show that the conditions for judicial estoppel exist, and she has failed to do so. *See Love v. Tyson Foods, Inc.*, 677 F.3d 258, 263 (5th Cir. 2012) (noting that the party asserting judicial estoppel bore the burden to establish it); *see also Vehicle Mkt. Rsch., Inc. v. Mitchell Int'l, Inc.*, 767 F.3d 987, 988 (10th Cir. 2014) (noting the same).  Accordingly, the Court denies plaintiff's request for judicial estoppel.

---

[143]    R. Doc. 28-5 at 25 (French Deposition at 25:24-25:14); R. Doc. 28-6 at 41 (Johnston Deposition 41:3).

[144]    R. Doc. 28-5 at 25 (French Deposition at 25:24-27:7).

## III.  CONCLUSION

For the foregoing reasons, Liberty's motion for partial summary judgment is GRANTED.  Liberty's motion *in limine* to exclude the expert testimony of Brandon Simoneaux is DENIED.  Bellina's motion *in limine* to limit the testimony of Liberty's experts is DENIED, and Bellina's request for judicial estoppel is DENIED.

New Orleans, Louisiana, this __7th__ day of April, 2021.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE